Mr. Evans and Mr. Higgins Mr. Evans, whenever you're ready. Good morning, Maine Police Court, Gary Evans, Ghosts of Evans, B.C., representing Captain Mark Gyves in connection with this case. Ironically, the last time I was before the court, privileged to appear before the court, I was involved in an airman's, where the future of an airman's livelihood was at issue. Judge Wiener made the observation in the Boetta case three years ago that what happened to the airman as a result of governmental action amounted to a scarlet letter, which we heartily agreed with, that would have a predictable and extremely negative impact on the airman for the rest of his flying career. That, coincidentally, is also what we have here with Captain Gyves. Captain Gyves operated his aircraft in Houston Intercontinental Airport on December 18, 2017. The Houston Airport System, specifically Terminal A, is believed to be the only location in the country, Terminals A and B at Houston Intercontinental, that essentially locks the airman into the jet bridge if they don't, in a situation where they do not depart with the rest of the passengers. That's the situation that Captain Gyves was found in on December 18, 2017. He had been delayed in departing the area to address some mechanical discrepancies with the aircraft. It took 15, 20 minutes for him to do that, and when he sought to depart, he found himself locked in the jet bridge with no way to contact operations. On the date of the incident, there was no phone number posted. There was a frequency, but that would involve returning to the aircraft and powering it up and things of that nature. Captain Gyves was in urgent need to use the restroom, and returning to the aircraft and starting the aircraft, the APU, the small jet engine that provides power to it, was not an option. That was going to take too long, as was swilling up the aircraft to call for dispatch assistance on the frequencies available through the aircraft's radio system. Nor was returning to the ramp an option for Captain Gyves, because those who have access to the Houston system airports are required to stay in the footprint of the aircraft, and there are no restroom facilities on the ramp either. Two flight crew members, let me go back just for a second, in previous situations where the flight crew had endeavored to depart the terminal area, resulted in delays of at least 10 to 15 minutes, and perhaps more, in situations where there's no other way for them to depart the jet bridge. Two other flight crew members, starting with First Officer Eric Little, and then later with Airman Gyves, were subsequently and vigorously interrogated by an individual by the name of Robert Lossack. A full recitation of Mr. Lossack's behavior appears in our briefing, but we should ask the court to note that with respect to Mr. Lossack's behavior, he did not identify himself and what his capacity was with the Houston airport system. He did not announce that he was conducting an investigation. He provided no admonitions to the subjects of his interrogation as to what would happen if they failed to cooperate with his investigation. Captain Gyves cooperated with respect to the investigation by turning over his identification. At some point, Mr. Lossack provided Captain Gyves with permission to leave the area, which he did. During the entirety of the conversation, no mention of any kind was made that Captain Gyves was under some type of requirement, statutory or otherwise, to cooperate with Mr. Lossack, and it is imperative to note that the only thing that Captain Gyves asked for was to be represented by counsel. The HAA's representative at no point did state to Captain Gyves that he was allegedly in violation of any rule published by the Houston airport system. A subsequent administrative hearing took place that supported the permanent lifetime ban of Captain Gyves from operating into and out of any Houston airport system airport, and that's Rule 41 found in the operating instruction, which endeavors to place some level of, some burden of cooperation on the airman that is subjected to some type of inquiry, although no place in Rule 41 does it say that the airman is required to participate in a discussion. It's a basic principle of due process, and a statute is void for vagueness if its prohibitions are not clearly defined. It's unconstitutionally vague if it fails to provide those targeted by the statute a reasonable opportunity to know what conduct is prohibited. What does cooperation mean, if not to participate in a discussion?  I believe faithful is a word that's defined. I would have to defer just to the normal use of the word cooperation, and I believe that Captain Gyves... Wouldn't it at a minimum mean answering questions? Well, as with any statutory construction, it would seem that the acting authority, if they wish to make that a specific requirement within the statute, they would say so. Unfortunately, Rule 41 makes no mention of actually being required to engage in a conversation with the interrogating officer, the representative of the Houston Air Force System. What does it require? Pardon me. Rule 41 identifies... It mandates... The text is failure or refusal to fully, completely, timely, and truthfully cooperate, but then it goes on to state, Your Honor, including appearing when and at the place designated with an investigation, audit, or a proceeding by or institute by or flowing from the acts of any division of HAS, misrepresentation or falsification, including, but not limited to, intentionally or knowingly or recklessly leaving off any relevant information on any document delivered to Houston Air Force System. So the only document that Captain Gyves sought to deliver to Mr. Losak was his identification badge, and that's what he requested. Mr. Losak, at the end of the interrogation, he made this sweeping motion, and when Captain Gyves asked if he was free to go, keep in mind that at this particular point in time, he had been confronted by not only Mr. Losak, but three or four of his associates, all wearing badges, all toting radios and things of that nature, and as noted in his affidavit attached to the resistance to the motion for summary judgment, he had formed the reasonable belief at that point that he may very well be a candidate for being carded off for some violation of a TSA rule. He was concerned that he may be arrested at the time, which served as the basis for his sole request that he made of Mr. Losak, which was to allow him to be represented by counsel. And if we go back to the Supreme Court case, Wainwright v. Greenberg, the inference should be that just because an individual decides they would like to be assisted by counsel, that that imparts some negativity to the fact that they remain silent at the time, and clearly that's a Miranda warning type of situation. We believe that the rule, even though it's not a statute, is impermissibly vague and ambiguous. I understand he asked if he was free to leave, and they said yes. That's correct, Your Honor. And so there was no attempt to inform Captain Jives that he was under this obligation to comply with Rule 41, and I'd like to talk just for a second about the fair notice requirement. All of the cases out there that address substantive due process, the procedural due process, we see the words fair notice all the time. And for the life of me, I could not understand where an airman would go to find information regarding that they're supposed to be bound by this thing called the operating instruction that's published by the Houston Airport System. You can't find it on Google. It does not appear in any airport facility directories. It doesn't appear in any reference materials that an airman would normally access in fulfilling his obligations under the Federal Aviation Regulations. And so I'm not sure, it does not give just lack of fair notice. It gives no notice whatsoever to an airman flying into any of the Houston Airport System airports that if you refuse to comply with these rules that are set forth in the operating instruction, various bad things could happen to you, including a lifetime ban. Well, why didn't the actual hearing, full hearing, which ensued and from which this ban came forth, why isn't that a sufficient provision of due process procedures notice? Good question, Your Honor. There are certain things that the hearing officer is not entitled to review. The hearing officer is not entitled to review any issues of law, mitigation, probation, or reduction of sanction. And moreover, the operating instruction itself states that there are two potential sources of adjudicatory reward. One, three representatives of the Houston Airport System management executive level. The other is a quote-unquote contract hearing officer. A contract hearing officer, when we read the rule, would cause us to believe that Ms. Flanagan would be a disinterested party to the case. But in terms of looking at the substitute process and the fact that all the cases that stand for the proposition that you need a fair and impartial tribunal, she is also a City of Houston employee. And so I don't know that she, as we've put in our briefing, I don't know that she fits the definition. Are you saying that the hearing failed to provide due process because it was improperly constituted? They weren't a disinterested person sufficiently or what? We believe that that's one reason, Your Honor, yes. But did he have an opportunity to explain his situation and what had happened? During the hearing, yes, he did. And what was the, under the rules, was the range of remedy or punishment, if you will, that the board was authorized to impose? We know what they did, but what were the range that they had? What were the choices? Well, if I could answer that in two parts, Your Honor. First of all, under the operating instruction, a Class 2 violation, there's only one sanction, and that's permanent lifetime ban from any business being conducted at any business. Any violation? Any violation of non-cooperation? If it's deemed to be a Class 2 violation. Well, what does that mean? Rule 41 is a Class 2. If you violate Rule 41, Your Honor, it's a Class 2 violation. I understand that. Violating that is simply about not cooperating, quote. Allegedly not cooperating, whatever that word may mean with respect to this. So you're saying that if you are found to have not cooperated, that what was the board authorized to find? What were they there to hear? They were there to hear the story told by each side of the case and whether or not the violation was going to be sustained. And the hearing officer was bound to determine whether the violation was sustained or denied, and she found that it was sustained. And that's the only finding that she could either, you know, thumbs up or thumbs down. That was the total latitude that she had apparently. Apparently by what metric? Any standard? The operating instruction says that by preponderance of the evidence, Your Honor. That he didn't cooperate? With respect to cooperate. I don't know. I'm trying to frame the charge against him, how they put it. Failure to cooperate. There's nothing in there about him misusing the access. No, Your Honor. Even as we stand here today, Captain Jive has never been accused of improperly operating the emergency exit from the jetway. He's never been the subject of any type of a sanction based upon that. So it comes down then to asking for a lawyer to explain his position results in a total ban from use of the airport? Yes, Your Honor. That's precisely what happened here. That's your contention. I'm sorry, Your Honor? That's your contention, right? Yes, Your Honor. And I'd just like to add, as far as the sanction goes, we looked at the TSA range of sanctions that are available in this type of situation. And there are monetary sanctions, certainly. But in looking at the TSA publication, we found that it could be a fine of anywhere from a few hundred dollars up to $4,000 in that range. You're confusing me now. You said TSA, right? Yes, Your Honor. We were trying to compare by way of illustrating the fact that Captain Jive is looking at a potential detriment of up to $8 million over the course of his career based upon a lifetime ban because he can't bid the trips, the four-day trips that fly in and out of the Houston airport system. And those are the far more desirable and far more financially beneficial trips. I understand that. What I'm trying to follow you is I thought you said that the board – the only thing that the hearing reported him was whether the charge was sustained. And if he sustained it, that the ban followed from that lifetime ban. That's correct, Your Honor. What's its range of penalties? What I was doing was trying to analogize to what would have happened had there been an accusation that there was a TSA violation. There was no such accusation. But we were trying to analogize to see, well, if the TSA got concerned over the use of this door, what could be a potential fine? And that potential fine could be in the range of $4,000 with an absolute cap of just over $13,000. And that goes to our argument that this case clearly violates the excessive fines clause of the Eighth Amendment. The lifetime ban results in a penalty of up to $8 million for Captain Jives, which is why we believe it's completely and woefully excessive in this circumstance. Does the record show any history of the application of this rule before or since? Your Honor, I think this is a case of first impression. I have not found a single case.  I'm sorry, Your Honor? Has there ever been a pilot before? Not to be – our understanding from talking with H.S. personnel, Your Honor, is that this is the first time that they've tried to impose and enforce a lifetime ban on any airman at any Houston system airport. Okay. Thank you, sir. Thank you. That's terrible. Can I get some? All right. May it please the Court. I'm Robert Higgison for the City of Houston. This case is pretty simple. This can be decided on the lack of evidence of the Monell factors. Judge Lake decided it on there being no evidence of constitutional violations. Didn't even get to the lack of evidence of Monell factors. But unless there are evidence of constitutional violation and the Monell factors, there's no case here. Mr. Jives didn't sue Mr. Lozak, who is the one who is involved here. Are you arguing Monell? Indeed. This is the only way – Monell imposes no vicarious liability as far as a policymaker, but you're saying that an agency that is authorized by the city to impose a lifetime ban is not a policymaker? He's absolutely not a policymaker. Oh, that's nonsense. No. Well, Your Honor – I'm sorry. Well, Your Honor, certainly Your Honor can laugh and say that's nonsense, but Mr. Lozak is not a policymaker. There is no authority. This Court – which is a creature of the city. Soon, somebody authorized by the state did that. If that were enough to be a policymaker, then there would be no jurisprudence from this Court saying that a policymaker has to be identified. Why not just argue – I don't have any more comments about that, but it's unusual. Why not just focus on whether there's a constitutional violation? There is no excessive fine because the fine of the lifetime bar from operating Houston Airports is laid out in Rule 41. And what was imposed was exactly what was set out there. It wasn't something that was arbitrary and thought of by Mr. Lozak or by the hearing examiner. There is no – and it's rationally related to the city's need for securing – Who created the rule? Sorry? Who created the rule? We don't have evidence in – presumably. That evidence is not in the record, but presumably – It doesn't have to be in the record. It's a matter of law. Who created this board? It would have been created by some division of the city, some portion of the city. Houston Airports System is an independent entity that's a part of the city, but it operates separately. But it is – yes, it's an extension of the city. It's a part of the city. And if we – I assume, Your Honor, that your question – Under what authority was this board conducted? Who authorized this? I mean, where did they derive their authority? This is not a bunch of people just getting together to do it. They did it under a set of rules and set up. Now, who created that? At some point in history – and this is not in the record, but at some point – Your Honor, do you want me to try to answer the question the best that I can? I mean, at some point someone, perhaps city council, at some point said we're going to set up Houston Airport System. I'm sorry, counsel, but I thought you were here to defend it. I thought you – this board, I thought you would know who it is. You're telling me that it's – we don't know how this was created. Maybe it just got out of thin air. Somebody created it in history, but it's not in the record. Your Honor, I'm not used to being mocked. I'm not mocking you. You're not answering my question. I'm doing my best to answer your question, Your Honor. Okay. We'll leave it at that. Is there anything in the – I apologize if you think I'm mocking you. It's not personal. It is your argument that I find difficult to follow. I'm not trying to get an explanation from you. I'm doing my best to answer your question. I appreciate that. I'm not quarreling with that. But if you don't have an answer to it, that's fine. But I just didn't – I apologize if you think I'm mocking you. That is not my purpose and intent. I'm just totally surprised at the argument. That's all. That's all it was. Your Honor, there are three minor factors that present no evidence of any of them. Even if we assume that he's identified a policymaker being the city council, there is – and even if you call this a policy, they still haven't shown a constitutional violation of this being closed. That's a different argument. And so to continue on with this being an excessive fine, it's out there. It's the fine that was authorized by the statute. That makes it not excessive under this court's and the Supreme Court's cases that I've cited in my brief. Authorized by what statute? I'm sorry. I haven't – Authorized by what statute? By the operating instructions is what's standing in for the statute here. If we were to trace this all the way back to some statute that authorizes the city to then delegate authority to do this, then that would take some significant – or some significant briefing, Your Honors. Judge Lake viewed that as the authorizing stand-in for the statute. Because, again, this is not a criminal matter. This is an administrative, civil, administrative – has been visited about this pilot. Indeed. And that perhaps constitutional procedural due process would require more than what was afforded him in this case. Judge – Has that been briefed or has anybody argued about that? I think that this would fit better in a procedural due process argument, but that isn't what the plaintiff pleaded. The plaintiff argued substantive due process, not procedural due process. So he's just out of luck on the procedural due process? I believe so. Now, I think that it would have survived a procedural due process analysis, but that isn't before the court. Is that because it was in the original complaint, but then taken out when the plaintiff amended their complaint? Sorry, yes, Judge. You don't think we would have the authority to remand this to Judge Lake to have him consider a procedural due process? Your Honor, I'm hesitant to tell this court that it doesn't have the authority to do things like that. I think that you probably do. I think that it – Well, hold on. Just to be clear, there is no procedural due process claim presented to the district court? That's correct. It's not here. Now, I think, Judge Dennis, that if the court did that, and this is because the court has great, broad authority, and so I can't say that you don't have the authority to do that, but I am saying that it wasn't before the district court. But if somebody sues in breach of contract, we can't grant relief on tort. Exactly. And so it does seem to be the wrong way to go about this. A substantive due process is presented. Yes, it is. So why don't we talk about that? Well, there is no evidence of a constitutionally protected right here. He's talking about his freedom interest in deciding his career choice and where he wants to do that, where he wants to apply that career choice. And incidentally, I agree with Judge Dennis. This lifetime ban is severe, but that doesn't eliminate his ability to be a pilot. He can be a pilot elsewhere but not here. Furthermore, and I don't know if this is the case or not, maybe he can apply for a reinstatement. I don't know. I understand lifetime permanent ban, that means something. But when someone is disbarred from the practice of law, sometimes they can go back and show, hey, look, I've done these certain things. Please let me back in. Let me do this. So I don't know if it's analogous to that or not. And there could be a way that he could – or someone could ask that this rule be changed. In any case, I agree that this is a very serious – Is that in Rule 41 or whatever rule we're talking about here? Rule 41 is what I'm talking about. And it's – It does provide for a lifetime ban? Yes. It says it – and you can find this easily in Mr. Jive's record excerpts. Class 2 sanctions right here at the top. First thing it says in bold print, permanent loss of ID badge and access rights at all HAS airports. Violators of a Class 2 violation are subject to immediate temporary suspension. Okay, so they get immediately temporarily suspended and then they get permanent loss. And the difference between the immediate temporary and the permanent would be a time for this investigation. And if Mr. Jive's had answered questions instead of having a subjective attitude that maybe I'm about to be arrested and so I don't want to answer any questions, his subjective perception of this is immaterial. What matters is that there's a – he knew that he had violated the TSA security. And so he thought that he was about to get arrested for that. So he knew that he'd done something here. But what he should have done is answer some questions. Regardless of how objectionable Mr. Lozak's conduct might have been. I mean, there isn't any respondeat superior here. And he didn't sue Mr. Lozak, who might conceivably have been liable. Just conceivably. I mean, we're not here defending Mr. Lozak. But the first line of Rule 41, after the heading of what the sanctions are, then notice of violations, Class 2 notice of violations, Rule 41, failure or refusal to – and listen to these words – fully, completely, timely, and truthfully cooperate. And then it goes on to have a few more lines after that. But the opening phrase is fully, completely, timely, as in right now, and truthfully. And so when he tells Mr. Lozak, I'm not going to answer any questions until I have a lawyer, well, he's violated this. Now, he has an opportunity then to explain to the adjudicative hearing officer that this wasn't really a violation, I was really cooperating. And the only thing that Mr. James's counsel has mentioned today that illustrates cooperation is he turned over his ID badge when requested. But that isn't fully, completely, timely, and truthfully cooperating. Now, the city isn't trying to go after Mr. Jives. The city is trying to protect everybody at its airports. And all that's necessary here to make this rule constitutional is that it have a rational relation with the city's interest in securing its airports. This very building that we're in has an interest in securing everyone who works here and everyone who practices here. And if those interests were violated, there would be some kind of a code for that. Maybe not lifetime ban from the Fifth Circuit Court of Appeals. But then if someone were to violate the security at the front and then run off and have lunch and not cooperate, maybe a lifetime ban would be appropriate. But then maybe, as I was also suggesting, an appropriate thing would be, well, let's revisit this in a few years. I'm sorry. Something like that. And I think at this point, because we're speaking now about policy concerns, yes, this is serious. What he did was serious. Maybe he should go and apologize. Well, it's a fair policy. No one would quarrel with that, I wouldn't think. It's not our job to quarrel with that. My concern was that a policy of so great a policy that would be instituted that is set by somebody, and we don't know who really sets the policy other than some creature in the record. HAAS wasn't sued. Judge Higginbotham. In fairness to you, the Monell policy did not seem to be so well developed early on in the case. But I don't want to go back to re-argue that case, re-argue that issue. But, Mike, I still have this concern about when you talk about these large policies and so forth, that has a great force to it. But it also raises a tension about who set that policy. And the assertion that it's not a policy of the city of Houston is an argument that can be made. But your argument about saying that there's no Monell implications here is that at this level, this policy is so important and so on and so forth, but said that some airport entity, not demeaning their role, but something wholly apart from the city. Do you follow me? Judge, I'm struggling to hear you. I think I'm losing my hearing. I apologize. I apologize for that. I'm trying not to ask you to repeat yourself. I'm just trying to put together what I think I heard you say. And mostly I think it was a comment, maybe implying a question, with the exception of the question of the apology. I'm not sure, but I really heard the question. Well, I was not speaking up, and I will. I was trying to track your argument. And what you're in response to these questions you were saying is that this was a policy of great import and protect the city and citizens, et cetera, et cetera, which I said is an argument of great force. But it raises the tension then of whose policy it is and why it would be set at such a level that's so apart from the city of Houston. And the record doesn't show that. It just doesn't show it. Okay, yes, right. And that's the answer that I have. The record doesn't show that. I will try to fill this in a little bit more, why I'm bothering with the Monell argument, because that seems to have kind of hit a button for you of some kind. No, I just don't. It's the gravity of the consequence and the gravity of the protection in the argument you're making that it seems to be in tension with a notion that this is somehow set by a nonentity out there that is not really a product of it in terms of Monell. Okay. I don't mean to be saying that it's set by a nonentity. What I'm saying is that the only way of getting municipal liability is through Monell. All right. Not responding to that. I don't suggest the case turns on Monell, because I think the procedural due process may well have been accorded. But that's why I was raising this difficulty that I have with the argument of its gravity, its force, its sweep, its bite, and not having been set and not reflecting a policy of the city of Houston. Or at least we don't know that. Well, if we interpret Rule 41 as a policy of the city of Houston and we say that the pleading identified Rule 41 as a policy of the city of Houston and thus fill in Monell that way. All right. Here's what I'm suggesting. If somebody wants to sue the city of Houston, under 1983, they need to plead and show the Monell requirements. They need to identify a policymaker, identify the policy, and identify the constitutional violation and how the policy was the moving force of the constitutional violation. Now, here, none of that was pleaded. And so we're having to kind of—and this court can do this, of course—kind of fill this in, backfill sort of. All right. Here's the more or less the implied policy is Rule 41. Here's more or less the implied policymaker of the city of Houston, maybe the council at some point in the past when they created the Houston airport system, delegating to them the authority to pass rules to secure the airport. Okay. And so that means that there's someone in that stratum at the Houston airport system. And, again, suing HAS would be the same as suing the city of Houston. And so we could maybe fill that in, and then we still get over to what's the constitutional violation and the causal nexus there. And so that may then just devolve into Judge Ho's question about let's look at what the constitutional violations are. And I agree with Judge Lake that he hasn't given any evidence of an excessive fine, although this is a very serious, serious punishment, but not an excessive fine under the Constitution, and he hasn't given any evidence of substantive due process. He has raised issues about procedural due process perhaps, but abandoned them in his amended complaint. And it wasn't before the court below, so Judge Lake couldn't decide that, and we can't either. Pardon me. You can't either, I should say. I don't mean to be that presumptuous, Judge. Are the operating instructions made available to the pilots? That is not in the record, Your Honor, and this is one of Mr. Gives' In other words, they have not presented evidence that they weren't available. Exactly. Not an affidavit or a declaration? That's correct. Captain Giants has stated that he didn't know them, hadn't seen them, but that's different from saying that they aren't available. And you don't know if they're provided? I don't know. I'm happy to give the court 10 seconds. Thank you. Yes, sir. You have five minutes on rebuttal. Thank you, Your Honor. Judge Siegenbaum, if I could address your concern very quickly. And this is an evidence, the operating instruction itself. And I think what you were looking for is the authorized signature. The authorized signature is Mario C. Diaz, who signed the capacity of Director of Aviation. That appears on the very first page of the operating instruction. I think that disposes of any complaints that Mr. Lossack was anything but the tip of the spear operating on behalf of the city of Houston, the Houston airport system. Going back to Judge Lake's opinion, first of all, Judge Lake gave little to no consideration to the fact that all that Captain Giants had asked for was to be assisted with counsel. That's almost not a word in the opinion. And the reason that the case fairly calls out for remand, at least, is the fact that Judge Lake's opinion, it looks like something that would be written more after a bench trial than it does after in connection with the summary judgment proceeding. Won't burden the court with the standards that we all know apply to the burdens of proof that apply at the summary judgment stage in federal court. But it's pretty clear to us that Judge Lake viewed the facts and the evidence in the light most favorable to the movement, the city of Houston, as opposed to the non-movement. And so I think he succeeded in flipping the burdens of proof in that regard. How so? Because it seems to me that we have the facts, as you agree to, that he did not answer questions. He insisted on an attorney. Yes, Your Honor. And there's an affirmative duty to cooperate under the operating rules. There wasn't much of a discussion about Captain Giants requesting counsel. It seemed as though at the summary judgment phase— I'm not sure why that matters to the extent that you acknowledge he didn't cooperate. He didn't answer questions. He didn't engage in discussion. He insisted on essentially not participating in the conversation. We would not suggest that Captain Giants failed to cooperate. We believe that he cooperated by turning over his identification badge. And the city already knew that. Was he asked questions? To my knowledge, Your Honor, based upon the record that we have, Mr. Losak—and this is the behavior that shocks the conscience. If you're looking at the violations that occurred and the— Captain Jives, if you look at his affirmative, which is attached to the resistance, he said that he never got a chance to answer any questions because Mr. Losak kept cutting him off at every opportunity. Now, the problem with that is that one man's ceiling is another man's floor. And so Mr. Losak comes in, and he knows that he's trying to elicit some cooperation from Captain Jives. And I don't know about your experience in just regular human interaction. If you want somebody's cooperation, you don't generally go at them with a vigorous, combative, aggressive, accusatory tone and expect anything good to come out of it. And unfortunately, that's what happened with Mr. Losak, not only on this occasion but— Your contention is he didn't cooperate, he didn't answer the questions because the officer was very belligerent. He never had the chance, Your Honor. He was cut off at every—and this is uncontroverted testimony that's in his affidavit, Your Honor. Absolutely. We don't believe that Rule 41 is rationally related in any respect. And let me address just the comment from opposing counsel on the fact that the sanction appears as a lifetime ban. That's not the end of the inquiry because otherwise there would never be a constitutional challenge if the sanction appears in some statute or some rule someplace. What if a Class II violation, the sanction prescribed, was death by firing squad? I seriously doubt that that would meet the constitutional commands with respect to whether or not it's an excessive fine, and therefore the inquiry, just because it appears in the operating instruction, does not mean that it's an excessive fine. And, of course, we've got the recent Timms case on that out of the Supreme Court. I'd like to correct my previous reference. The case I was referring to, I'm merely asking for counsel. That's Wainwright v. Greenfield, and that's that 1986 United States Supreme Court case. In Timms v. Indiana, if you look at the disparity between the amounts in controversy, the individual was subject up to a $10,000 fine, even though the actual amount of controversy for the case was far lower than that. On the strength of that, the state of Indiana seized its $42,000 Range Rover, and the United States Supreme Court here in 2019 told us that that violates the excessive fines clause. So here we have the lifetime ban with a potential negative financial impact on Captain Jives up to $8 million, which would seem to be not rationally related to any particular goal. How did he get to $8 million? That's based upon his career goals of going to a—he currently flies for Republic Airlines, Your Honor. His career aspirations include flying for a major airline, and with the hub-and-spoke system that we have here in this country with our airlines, Houston is probably top three, if not the top hub in all of the hub-and-spoke system, which would preclude him from going to a major air carrier and saying, oh, by the way, I can't fly out of any Houston airport. Your time has expired. Thank you, Your Honor. May I be excused? Yes. And that concludes the cases set for oral argument this morning.